The complaint, upon which the questions in this case arise, sets out what appears to be a regular governmental organization, with its constitution and laws, and powers legislative and judicial. The head of this organization is a congress of representatives, called the Grand Lodge of the United States, which not only legislates for all lodges in the several states, but also exercises judicial powers over them; for the complaint states that the grand lodges of the several states are subject at all times to the resolves, orders and decrees of the congress of representatives, and are amenable to its constitutional authority. The grand lodges of the several states and districts exercise similar powers. They grant, revoke and renew charters, make by-laws, and pass judicially upon charges presented against subordinate lodges, expelling or reinstating them at pleasure. These powers extend to the confiscation of the entire property of a subordinate lodge, whenever, in the opinion of the grand lodge, upon a case brought regularly before it, it shall satisfactorily appear that such subordinate lodge is guilty of insubordination. Now all this is very well, so long as the lodges neither violate nor ask any aid from the law; but it may with propriety be doubted whether the judicial power of the state is to be invoked to uphold and enforce the decrees of these self-constituted judicatories.
It is to be remarked that these lodges are charitable institutions, whose objects commend them extensively to public favor, and that there are four hundred of them in northern New-York alone, and, being purely voluntary associations, there is, of course, no limit to the amount of property which *Page 119 
they may acquire. If this suit can be maintained, then all this property, however vast, is ultimately controlled, not by any power within the state, but by the Grand Lodge of the United States; for, by the constitution of these lodges, as given in the complaint, it will be seen that on the expulsion of any subordinate lodge (which is a matter resting entirely in the will of the grand lodge of the state or district), the whole property of the lodge expelled is, ipso facto, vested in the grand lodge, which is under no obligation to reinstate the lodge or restore the property; and, as the grand lodge of the state is bound to obey the decrees of the national lodge, the whole property is thus brought under the control of the latter. This is entirely unobjectionable, so long as submission to these decrees is merely voluntary; but the question is, whether that submission is to be legally and judicially enforced.
Let us see what a chancellor of England said about a case very similar to this. I refer to the case of Lloyd v. Loring (6Ves., 733). That was a bill, filed by Evan Lloyd and two other persons, to get possession of the dresses, decorations, books, papers, c., of a lodge of Free Masons, called the Caledonia Chapter, No. 2. The plaintiff stated that this lodge was regularly organized under a charter from the Grand or Head Chapter of Royal Arch Masons; that they were its chief officers, and as such were entitled by virtue of the rules of the society to the charge and custody of the property, c., which the defendants had forcibly removed. The defendants demurred there, as here, to the bill. The opinion of Lord Chancellor ELDON, in that case, is so precisely applicable to this, that I will make one or two extracts from it. He said: "A bill might be filed for a chattel, the plaintiffs stating themselves to be jointly interested in it with several other persons; but it would be very dangerous to take notice of them as a society having anything of constitution in it. In this bill there is a great affectation of a corporate character. They speak of their laws and constitution, and *Page 120 
the original charter by which they were constituted. In Allen
v. The Duke of Queensbury, Lord THURLOW said he would convince the parties that they had no laws and constitutions." And again: "That this court will hold jurisdiction to have a chattel delivered up, I have no doubt; but I am alarmed at the notion that these voluntary societies are to be permitted to state all their laws, forms and constitutions upon the record, and then to tell the court they are individuals, c. The bill states that they subsist under a charter granted by persons who are now dead; and therefore, if this charter cannot be produced, the society is gone. Upon principles of policy, the courts of this country do not sit to determine upon charters granted by persons who have not the prerogative to grant charters."
This appears to me to be apt and sensible language in the case in which it was used, where the charter, constitution, c., were barely referred to; but with what increased force does it apply to the case before us, in which we have spread upon the record two formal constitutions, one of which contains fifteen distinct articles, the other eleven, each article being subdivided into a variety of sections, and all together embracing a complete system of governmental polity. There is, however, no objection to all this, provided we apply to these articles the same rules as to ordinary agreements inter partes, and give to them no peculiar force as the constitution and laws of an organized body.
Admitting, then, the action to be well brought, in the name of the treasurer, under the act of April 7, 1849, about which I will not stop to inquire, it is clear that the plaintiff can only recover by showing either a legal or equitable title to the property in question in the lodge which he represents, that is, in the associated members of that lodge. How does he show this? It is conceded by the complaint that the property originally belonged to the lodge expelled, of which the defendants were members. The defendants, therefore, were tenants in common, with the plaintiff and his *Page 121 
associates, of the property, and had an equal right with them to its custody. It is incumbent on the plaintiff to show a legal transfer of this title. This he assumes to do by showing the expulsion, by the grand lodge, of the old Cayuga Lodge, and the restoration of the new. The effect is supposed to be wrought through the operation of the constitutions of the two lodges. But it is obvious that these constitutions can have no binding force whatever, except what they derive from the assent of each individual member. That is, any member, to be bound by them, must have personally assented to their provisions. It is only as contracts that these constitutions are in the least obligatory. The counsel for the plaintiff takes this view of the case in his printed argument. He says: "The court is sitting to judge between individuals as to rights acquired by the contracts between them. It is immaterial whether such contracts are made in the form of subscriptions to general constitutions and by-laws or to separate articles of agreement."
Viewed, then, as contracts, these constitutions must be subject to the same rules with all other contracts. It must be clearly shown that the defendants have assented to the written constitutions of these lodges.
The complaint avers that the members of the present Cayuga Lodge "have, each and every one of them, in conformity with the usages and requirements of the order, subscribed to an article of association denominated a constitution, a copy of which is hereunto annexed," c. There is also a general averment that the grand lodges in the several states have constitutions to which their members are obligated to subscribe, and do subscribe, and that one of these grand lodges is denominated the Grand Lodge of Northern New-York, and that this lodge has public and printed articles of association, styled a constitution, a copy of which is thereunto annexed. But there is no averment that this constitution was ever in fact subscribed by anybody, nor does the complaint contain any direct averment that the *Page 122 
defendants ever subscribed the constitution of any lodge, either grand or subordinate. The averment relied upon by the plaintiff upon the subject is this: after stating the existence of the original Cayuga Lodge, and that the plaintiff and his associates and the defendants were all members of that lodge, the complaint proceeds thus: that, as such members and associates, they had, each and every of them, covenanted with each other to observe, obey, conform to and abide by the constitution, by-laws, rules and regulations of the said lodge, and of said Grand Lodge of Northern New-York.
Covenanted? How? Under their hands and seals? It is not so averred. There is neither profert nor offer to produce the covenant. Will this do in a legal pleading? I apprehend not. It is altogether too vague.
Again, what constitution did they covenant to observe? The averment says, "The constitution, by-laws, c., of the Cayuga Lodge, and of said Grand Lodge of Northern New-York," but does not set forth the constitutions in this connection, nor give any reference by which they can be identified or their provisions ascertained. We may conjecture that the plaintiff means the same constitutions which are referred to elsewhere in the complaint, but it is not so averred.
If we look at the whole complaint, we shall see that it is not intended to be averred that the defendants ever subscribed the constitution of the grand lodge. This was done only by the members of the grand lodge itself. It is difficult to see, therefore, how the provisions of that instrument are to be made obligatory upon the defendants as a contract. There is nothing in the constitution of the expelled lodge (which probably was subscribed by the defendants, although that is not in terms averred) which adopts the constitution of the grand lodge. It is this latter constitution alone which confers the power by which the property in question is claimed to have been transferred. *Page 123 
But were it distinctly averred that the defendants had subscribed the constitution of the grand as well as of the subordinate lodge, I should still be of the opinion that public policy would not admit of parties binding themselves by such engagements. The effect of some of the provisions of these constitutions is to create a tribunal having power to adjudicate upon the rights of property of all the members of the subordinate lodges, and to transfer that property to others; the members of this tribunal being liable to constant fluctuations, and not subject in any case to the selection or control of the parties upon whose rights they sit in judgment.
To create a judicial tribunal is one of the functions of the sovereign power; and although parties may always make such tribunal for themselves, in any specific case, by a submission to arbitration, yet the power is guarded by the most cautious rules. A contract that the parties will submit, confers no power upon the arbitrator; and even where there is an actual submission, it may be revoked at any time. The law allows the party up to the last moment to ascertain whether there is not some covert bias or prejudice on the part of the arbitrator chosen.
It would hardly accord with this scrupulous care to secure fairness, in such cases, that parties should be held legally bound by the sort of engagement that exists here, by which the most extensive judicial powers are conferred upon bodies of men whose individual members are subject to continual fluctuation.
Upon all these grounds, therefore, and especially upon the ground that the complaint does not show that the defendants have ever assented to be bound by the provisions of the constitution of the Grand Lodge of Northern New-York, as the same is set forth in the complaint, I am of the opinion that the complaint is insufficient, and that the judgment of the Supreme Court should be affirmed. *Page 124